**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 11-cv-03357-WJM-KLM

GUY DEFAZIO,

    Plaintiff,

v.

STARWOOD HOTELS & RESORTS WORLDWIDE, INC., a Maryland corporation

    Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff Guy DeFazio ("Plaintiff") bring this action against his former employer, Starwood Hotels & Resorts Worldwide, Inc. ("Defendant"), alleging that he was terminated in breach of his implied employment contract and in violation of public policy. (ECF No. 1.) Before the Court is Defendant's Motion for Summary Judgment ("Motion"). (ECF No. 30.) For the reasons set forth below, the Motion is granted.

## I.  LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49

(1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132 (10th Cir. 2000); *Carey v. U.S. Postal Service*, 812 F.2d 621, 623 (10th Cir. 1987).

A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party. *Anderson*, 477 U.S. at 248. The Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II.  FACTUAL BACKGROUND

The relevant facts, taken in the light most favorable to the Plaintiff, are as follows.

On November 22, 2008, Plaintiff Guy DeFazio began working for Defendant as a general maintenance engineer at its location in Steamboat Springs, Colorado. (Pl.'s Aff. (ECF No. 33-1) ¶ 1.) Pat Lichenstein was the Director of Engineering and Plaintiff's direct supervisor. (Pl.'s Dep. (ECF No. 30-2) at 27.) Shortly after Plaintiff was hired, he was given a copy of Defendant's Code of Business Conduct ("Code") and signed an certification stating that he received and was responsible for familiarizing himself with the Code's contents. (*Id.* at 23; ECF No. 30-5 at 7.) Plaintiff was also given Defendant's Associate Handbook ("Handbook") and signed an acknowledgment stating that he was responsible for familiarizing himself with the Handbook's contents. (Pl.'s Dep. at 19-20; ECF No. 30-4 at 54.)

In 2008, the hotel began a $20 million renovation project that included a new HVAC system in the guest rooms. (*Id.* ¶ 3.) In early 2009, Plaintiff was assigned to be

the primary engineer on the HVAC portion of this project. (*Id*.) The controls portion of the HVAC renovation was subcontracted to Commercial Systems Integrators ("CSI"). (Pl.'s Dep. at 44.)

As a result of the hotel's renovations, the building was sealed tighter, which in turn led to moisture build-up in the guest rooms. (Lichenstein Dep. (ECF No. 30-6) p. 28.) As guest rooms did not have a way to remove the excess moisture, mold grew in some guest rooms. (Pl.'s Aff. ¶ 3; Pl.'s Dep. at 51.) Employees were encouraged to report mold when it was located. (Pl.'s Dep. at 132.) The affected room was then taken out of service until the room was dried and the mold was cleaned up. (*Id*. at 59; Lichenstein Dep. at 43.) The hotel was able to remain open through the 2008-09 ski season by implementing temporary remediation measures, including large water extractors and large fans. (Pl's Aff. ¶ 6.)

In July 2009, Plaintiff was informed that CSI has been chosen to address the moisture build-up issues causing the mold. (*Id*. ¶ 8.) CSI installed humidity stats in all guest rooms which caused the humidity to condense on cold water pipes and be removed from the room. (Lichenstein Dep. at 30, 50.) Plaintiff disagreed with the remediation plan because tests had shown that it would not remove enough moisture to cure the mold problem. (Pl.'s Aff. ¶¶ 9-10.) At that time, Plaintiff did not voice his concerns with the remediation plan or complain about the choice of CSI to do the work. (*Id*. ¶¶ 13-14.)

In September 2009, Plaintiff prepared a job description for himself, which included management of projects, compilation of information for bids, and training and supervising staff. (Pl.'s Dep. at 85-87.) Plaintiff also prepared an engineering

3

improvement proposal and asked his supervisor to forward it to a group of Defendant's executives that were coming to evaluate issues in each department of the hotel. (Pl.'s Aff. ¶ 13.) Mr. Lichenstein responded in an angry and condescending manner and told Plaintiff that his proposal would not be given to the executives and that he was spending too much time monitoring CSI's failures. (*Id*. ¶ 14; Pl.'s Dep. at 100-01.) After raising this issue, Plaintiff felt his supervisor became more resistant to his concerns and engaged in "acts of retaliation". (Pl.'s Aff. ¶ 15.)

On November 15, 2009, CSI had difficulties accessing a system because Plaintiff was working on the same system. (Pl.'s Dep. at 92-93.) CSI threatened to bill Defendant for its time lost as a result of this incident. (*Id*. at 93-94.) Plaintiff was not disciplined but Lichenstein instructed him to apologize to CSI and he did. (*Id*.) Plaintiff viewed Defendant's response to the situation, including the instruction that he apologize, as "extremely inappropriate." (*Id*.)

On November 21, 2009, Plaintiff took his concerns to Carl Sokia, Defendant's Director of Human Resources at the hotel. (Pl.'s Aff. ¶ 16; ECF No. 30-7.) Plaintiff told Mr. Sokia about his frustration with the quality of work being performed by CSI as well as his dissatisfaction with how his supervisors were handling the situation. (ECF No. 30-7.) Mr. Sokia informed Plaintiff that he shared Plaintiff's frustrations and that he would look into the allegations and proceed according to Defendant's policies. (*Id*. ¶ 17.)

In December 2009, Plaintiff exchanged e-mails with his supervisor about maintaining safety logs and the time Plaintiff was spending as a member of the Safety Committee. (Pl.'s Dep. at 103-05; ECF No. 30-5 at 14-17.) Plaintiff forwarded this e-

4

mail exchange to Sokia because he thought Mr. Lichenstein was "attempting to find some kind of fault on my part with this particular issue, the loss of the safety log book." (Pl.'s Dep. at 104-05.) Plaintiff told Sokia that he believed Lichenstein was retaliating against him for putting together the engineering improvement proposal, which suggested fixes to long-standing problems. (Id. at 105; ECF No. 30-5 at 18.) Plaintiff was not disciplined as a result of the lost log book or his discussion of the matter with Sokia. (Pl.'s Dep. at 105.)

On December 31, 2009, Lichenstein informed Plaintiff that he would be assigned to work the night shift so that he could learn the duties of night shift employees. (Id. at 109.) Lichenstein also told Plaintiff that, as a result of a change in direction, Plaintiff would no longer have duties for the time-share portion of the property. (Id. at 110-113.) Lichenstein indicated that he would support Plaintiff's application for engineer positions at other properties and that he would tailor projects to assist Plaintiff with developing the skills necessary to strengthen his applications. (Id.)

After this conversation with Lichenstein, Plaintiff asked to meet with Sokia to discuss the changes to his work environment. (ECF No. 30-5 at 20.) Sokia understood that Plaintiff was unhappy with the expectation that he perform general maintenance engineer duties like changing light bulbs and painting. (Sokia Dep. (ECF No. 30-1) at 34-35.) Plaintiff again believed the change of duties was retaliation for his criticism of CSI and the suggestions contained in his proposal. (Pl.'s Aff. ¶ 28.)

On January 1, 2010, part of the system installed by the subcontractor failed overnight and dozens of guest rooms went without heat. (Id. ¶ 18.) This failure was not

reported, Plaintiff believes, "to protect the fragile status of the subcontractor [CSI]." (*Id.*) On January 4, 2010, Plaintiff reported the failure, as well as his general concerns about the CSI's work, to Defendant's Director of Operations at the hotel, who passed it along to Mr. Sokia. (*Id.* ¶ 19; ECF No. 30-5 at 21-22.)

Also on January 4, 2010, Plaintiff e-mailed Howard Wong, Director of Construction for Starwood's time-share property, about problems he had observed in the time-share property. (*Id.* ¶ 21; ECF No. 30-5 at 24-25.) Plaintiff attached pictures of freezing and reported complaints of louder than normal sounds coming from the systems. (ECF No. 30-5 at 24.) Plaintiff did not include Mr. Lichenstein on his e-mail to Wong. (*Id.*) Mr. Lichenstein believed that Plaintiff's communications with Wong were inappropriate because of their tone, because Plaintiff reported inaccurate information, and because these communications exceeded Plaintiff's job duties. (Lichenstein Dep. at 70-75.)

On January 7, 2010, Plaintiff was called into a meeting with Mr. Lichenstein and Mr. Sokia about the January 4 e-mail exchange with Mr. Wong. (Pl.'s Aff. ¶ 21.) Plaintiff was admonished that he should not communicate with "outside parties on behalf of the hotel".[1] (*Id.* ¶ 22.) This was a change of practices because Mr. Lichenstein had specifically directed Plaintiff, at least six months before, to have these communications directly with a number of Starwood executives, including Mr. Wong. (*Id.* ¶ 29.) Plaintiff was reminded of the procedures for reporting complaints contained

---

[1] From the record, it appears the time-share property is a separate entity from the hotel, owned by a subsidiary of Defendant. Thus, the Director of Construction for the time-share property was not in Plaintiff's chain of command. (*See* Lichenstein Dep. at 70-71.)

in the Code and the Handbook, which require complaints to be brought to his supervisors. (ECF No. 30-5 at 35.) Plaintiff was warned that he would be subject to further disciplinary action, up to and including termination, if he did not improve his "overall attitude, conduct or demeanor". (*Id.*)

On January 14, 2010, Plaintiff e-mailed Mr. Lichenstein a list of what Plaintiff considered to be his accomplishments and responsibilities over the past year. (Pl.'s Dep. at 138-39.) Plaintiff sent this e-mail because he had concerns about the discussions that occurred during the January 7, 2010 meeting with Mr. Sokia and Mr. Lichenstein. (*Id.*)

On January 19, 2010, Plaintiff wrote to Mr. Sokia about the directive he was given not to communicate with anyone outside of the department about his concerns. (*Id.* ¶ 25.) Plaintiff expressed his belief that this directive violated several provision of Defendant's personnel policies, and that the directive was retaliation for Plaintiff's complaints about the subcontractor's work. (*Id.*) Plaintiff's e-mail specifically cited Defendant's policies prohibiting retaliation. (*Id.* ¶ 32.)

Lichenstein believed that Plaintiff should be terminated because, beginning in the last quarter of 2009, Plaintiff spent too much time using a computer and not enough time performing the duties of a general maintenance engineer. (Lichenstein Dep. at 111, 117-19.) On January 21, 2010, Mr. Sokia met with Plaintiff. (Pl.'s Dep. at 165-66.) Plaintiff informed Mr. Sokia that he was generally happy working for Defendant, with the exception of a few people. (*Id.* at 166-67.) Mr. Sokia understood that Plaintiff was unhappy with the management in the engineering department. (Sokia Dep. at 57-58.)

Mr. Sokia informed Plaintiff that he was terminated because of his displeasure with management. (Pl.'s Aff. ¶ 26.)

### III. ANALYSIS

Absent an express contract providing otherwise, Colorado law presumes that an employment relationship is terminable at will by either party without liability. *Cont'l Air Lines, Inc. v. Keenan*, 731 P.2d 708 (Colo. 1987). Common law exceptions to this presumption include the two issues in this case: public policy and implied contract or promissory estoppel. *Crawford Rehab. Servs., Inc. v. Weissman*, 938 P.2d 540 (Colo. 1997). An employee hired without an express contract, such as Plaintiff, has the burden of pleading and proving one of these exceptions to at will employment. *Pickell v. Ariz. Components Co.*, 931 P.2d 1184 (Colo. 1997).

In this case, Plaintiff brings claims under both of the common law exceptions and alleges that he was terminated in breach of his implied employment contract as well as in violation of public policy.[2] (ECF No. 1.) Defendant moves for summary judgment on both of Plaintiff's claims. (ECF No. 30.) The Court will address each in turn below.

**A.  Promissory Estoppel**

Plaintiff brings a claim of promissory estoppel related to Defendant's alleged retaliation against Plaintiff for complying with certain provisions of Defendant's employment policies. (Compl. ¶¶ 88-92.)

As Plaintiff bears the burden of proving this common law exception to at will

---

[2] Plaintiff also brought a claim for express breach of contract. (ECF No. 1 at 10-11.) However, in his opposition to the Motion for Summary Judgment, Plaintiff "voluntarily dismisses" this claim. (ECF No. 33 at 10 n.1.) The Court will therefore enter judgment in favor of Defendant on Plaintiff's express breach of contract claim.

employment, Plaintiff must show a genuine dispute of fact as to each of the elements of his promissory estoppel claim. Thus, Plaintiff must show: (1) Defendant made a promise to Plaintiff; (2) Defendant reasonably should have expected that the promise would induce action or forbearance by Plaintiff; (3) Plaintiff reasonably relied on the promise to his detriment; and (4) the promise must be enforced to prevent injustice. *Cherokee Metro. Dist. v. Simpson*, 148 P.3d 142, 151 (Colo. 2006). Defendant challenges the first three elements of this claim.

With respect to the first element, Defendant contends that Plaintiff cannot show that it made a "promise" to the Plaintiff because the employment policies relied upon by Plaintiff were subject to a disclaimer that they did not create a contract and could be unilaterally altered by Defendant at any time. (ECF No. 30 at 22-23.) Colorado courts have held that, to create an enforceable promise, a statement must: (1) "either disclose a *promissory* intent or be one that the employee could reasonably conclude constituted a *commitment* by the employer"; and (2) be sufficiently definite to allow a court to understand the nature of the obligation undertaken. *Soderlun v. Pub. Serv. Co. of Colo.*, 944 P.2d 616, 620 (Colo. App. 1997) (emphasis in original).

Plaintiff first claims that whether he was an at-will employee is "ambiguous" because Defendant promised to terminate him only for a "lawful reason", and "[i]f it were truly an at-will contract, any termination would be considered lawful and, consequently, there would be no reason to make the above lawful-reason promise." (ECF No. 33 at 12.) However, Plaintiff's argument ignores the paragraph that immediately follows the "lawful reason statement." In the next paragraph, the Handbook states:

> Employment at Sheraton is at-will, meaning that you or Sheraton may terminate your employment with or without cause or notice. The at-will nature of employment at Sheraton can be changed only by a written letter signed by you and Sheraton's General Counsel. This handbook is not a contract for employment for any term and employment at Sheraton is for no specific duration. Sheraton reserves the right to modify or eliminate any or all its policies and benefits in the handbook.

(ECF No. 30-4 at 51.) Viewing the "Termination of Employment" policy as a whole, the Court finds that there is no ambiguity as to whether Plaintiff was an at-will employee. Defendant's clear expression of the at-will nature of Plaintiff's employment is not blurred by the statement that it may terminate Plaintiff for "any other lawful reason." (*Id.*)

Defendant's statement that it will only terminate an employee for a "lawful reason" is essentially just a commitment not to violate the law. It is not a statement that employees will only be terminated for good cause or according to any progressive disciplinary policy. *Compare Evenson v. Colo. Farm Bureau Mut. Ins. Co.*, 879 P.2d 402, 409 (Colo. App. 1993) (noting that an employer can create an implied employment contract where employee handbook contained mandatory termination procedures and requires "just cause" for termination). Despite Plaintiff's arguments to the contrary, the Court finds that Defendant's statement that employees may be terminated for "any lawful reason" does not create an ambiguity as to Plaintiff's status as an at-will employee.

Plaintiff also contends that he relied on Defendant's non-retaliation policy, which stated: "It is our policy not to discriminate or retaliate against any associate who reports any violation of our policies, provides evidence or who otherwise participates in an investigation in good faith." (ECF No. 30-5 at 5.) Plaintiff contends that he relied on

this promise in reporting his concerns about the mold and that he was terminated contrary to this policy. (ECF No. 33 at 16-17.)

While Plaintiff correctly recites a portion of the Code of Business Conduct, Plaintiff again ignores the paragraph that immediately follows the non-retaliation provision. The next paragraph in the Code states:

> Neither the Code nor our policies are intended, and do not in any way, constitute an employment contract or an assurance of continued employment. We do not create any contractual rights by issuing the Code or other policies and do not guarantee employment for any specific duration. Further, neither the Code nor our policies are intended to confer on an associate any rights that they are not entitled to under applicable local law.
>
> We may amend, modify or waive any provisions of the Code or our policies in our sole discretion.

(*Id*.) Colorado courts have held that, when a handbook contains a "clear and conspicuous" disclaimer like that set forth above, the employer has not expressed promissory intent. *See George v. Ute Water Conservancy Dist.*, 950 P.2d 1195, 1198 (Colo. App. 1997).

The record shows that Plaintiff signed the Code and certified that he was aware that he was responsible for reading and familiarizing himself with the Code. (ECF No. 30-5 at 7.) Because Defendant unilaterally reserved the right to change its policies at any time, and such reservation was clearly conveyed to Plaintiff in the paragraph that immediately followed the non-retaliation provision, Plaintiff has failed to show a dispute of fact as to whether Defendant's Code was an enforceable promise.

The Handbook and Code's disclaimer also doom Plaintiff's claim under the second prong of the promissory estoppel test—whether Defendant reasonably should

11

have expected that the promise would induce action or forbearance by the Plaintiff. The plain language of the disclaimer shows that Defendant did not intend to be bound by its policies and did not reasonably understand that an employee would rely on its policies. *See Geras v. Int'l Bus. Machs. Corp.*, 638 F.3d 1311, 1316 (10th Cir. 2011) (clear disclaimer in incentive plan shows that employer did not intend to be bound by its policies). Thus, the Court further finds that Plaintiff has failed to show a material dispute of fact as to the second element of his collateral estoppel claim.

Because Plaintiff has failed to meet his burden with respect to an essential element of his promissory estoppel claim, Defendant's Motion for Summary Judgment is granted as to this claim.

**B.    Wrongful Discharge in Violation of Public Policy**

Plaintiff also brings a claim for wrongful discharge in violation of public policy. (Compl. at 12-13.) The elements of this claim are: (1) the employer directed the employee to perform an illegal act or prohibited the employee from performing a public duty or exercising an important job-related right or privilege; (2) the action directed by the employer (or prevented by the employer) would violate a specific statute, regulation or professional code relating to the public health, safety, or welfare, or would "undermine a clearly expressed public policy relating to the employee's basic responsibility as a citizen or the employee's rights or privileges as a worker"; (3) the employee was terminated as a result of refusing to perform the act or carrying through with the prohibited behavior; and (4) the employer was aware, or should have been aware, that the employee's refusal to comply with the order was based on the employee's reasonable belief that the action ordered by the employer was illegal,

contrary to clearly expressed statutory policy, or violative of the employee's legal rights or privileges as a worker. *Jaynes v. Centura Health Corp.*, 148 P.3d 241, 243 (Colo. App. 2006) (citing *Martin Marietta Corp. v. Lorenz*, 823 P.2d 100 (Colo. 1992)).

In support of its Motion, Defendant argues that Plaintiff has failed to show that any specific statute, regulation or professional code establishes a public policy that Plaintiff was trying to protect. (ECF No. 30 at 24-28.) Defendant discusses each of the three statutes in Plaintiff's Complaint that allegedly formed the basis for his claim. (*Id.*) Defendant contends that Plaintiff cannot base his claim on the Occupational Health and Safety Act ("OSHA" because it contains its own anti-retaliation provision. (*Id.* at 25.) Defendant then argues that Plaintiff did not engage in behavior protected by the Worker's Compensation Act ("WCA") or the Colorado Consumer Protection Act ("CCPA"), so these statutes cannot sustain Plaintiff's wrongful discharge claim. (*Id.* at 26-27.)

Plaintiff's response utterly fails to meet his summary judgment burden. It is well-established that a party cannot rely on factual recitations in the pleadings to meet his burden on summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)("[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.") (internal quotation omitted). The facts supporting Plaintiff's claim must be identified by reference to affidavits, deposition transcripts, or specific exhibits. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). The section of Plaintiff's brief addressing his wrongful discharge in violation

of public policy claim contains <u>one</u> cite to the record, and that is to the Complaint. (ECF No. 33 at 17.) This effort falls woefully short of meeting Plaintiff's summary judgment burden.

Plaintiff also fails to discuss any of the four elements of his wrongful discharge claim. Most significantly, Colorado law requires that the employee identify the source of the public policy and prove that "the action directed by the employer would violate a specific statute relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's rights as a worker." *Rocky Mountain Hosp. & Medical Serv. v. Mariani*, 916 P.2d at 524 (citing *Lorenz*, 823 P.2d at 109). In his Response, Plaintiff fails to specifically identify any source of public policy that was implicated in this case. He retreats from his reliance on OSHA, WCA, and CCPA and instead argues that his claim is "premised on Colorado's public policy of protecting whistleblowers, who protect the public health". (ECF No. 33 at 17.) There is certainly support for the contention that Colorado permits a claim for wrongful discharge related to whistleblowing. *See Kearl v. Portage Envtl., Inc.*, 205 P.3d 496, 499 (Colo. App. 2008). However, the employee still must establish that the act he was reporting was clearly in the public interest. *Id*. Here, Plaintiff fails to identify any clearly-expressed public policy that was implicated by his actions.

Accordingly, the Court finds that Plaintiff has failed to meet his burden of showing a triable issue of fact as to his claim for wrongful discharge in violation of public policy. Defendant's Motion for Summary Judgment is granted as to this claim.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendant's Motion for Summary Judgment (ECF Nos. 30 & 31) is GRANTED;

2. The Clerk shall enter judgment in favor of Defendant on all claims; and

3. Defendant shall have its costs.

Dated this 17th day of April, 2013.

BY THE COURT:

_____
William J. Martinez
United States District Judge